UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-23669-Civ-SEITZ
        (09-20733-Cr-SEITZ)
MAGISTRATE JUDGE P. A. WHITE

WHITNEY LIBERAL,                :

        Movant,                 :

v.                              :           REPORT OF
                                        MAGISTRATE JUDGE
UNITED STATES OF AMERICA,  :

        Respondent.             :
_____

## I   INTRODUCTION AND BACKGROUND

This Cause is before the Court upon Movant Liberal's pro se motion to vacate, pursuant to 28 U.S.C. §2255 (consisting of Cv:DEs 1 and 4 together), attacking his convictions and sentences imposed after a December 2009 jury trial in Case 09-20733-Cr-SEITZ.

This Cause has been referred to the undersigned for consideration and report pursuant to 28 U.S.C. §636(b)(1)(B) and Rules 8 and 10 of the Rules Governing Section 2255 Cases in the United States District Courts.

The Court has for its consideration Movant's §2255 Motion/Memo (Cv:DEs 1, 4); the Government's Response to Order to Show Cause, with record citations (Cv:DE8); Movant's Reply (Cv:DE14, pp.1-15) with attached Affidavits of 2 co-defendants, Lawrence and Stevenson Benoit (filed respectively at Cv:DE4, pp. 16 and 17); the PSI with addendum and SOR; and the record in the underlying criminal case.

In an August 2009 Indictment (Cr:DE31) Movant Liberal, with co-defendants Lawrence Benoit, Stevenson Benoit, and Stanley Dumervil, was charged in case No. 09-20733-Cr-SEITZ. The Indictment charged one count of conspiracy to commit access device fraud (Count 1), in violation of 18 U.S.C. §1029(b)(2). It charged two counts of substantive access device fraud: Count 2, use of 1 or more unauthorized access devices within a one-year period, in violation of 18 U.S.C.

§§1029(a)(2) and 2; and Count 3, possession of 15 or more counter-feit or unauthorized access devices, in violation of 18 U.S.C. §1029(a)(3) and 2. Finally, it lodged fourteen counts of aggravated identity theft, Counts 4-17, charging that the defendants did "know-ingly possess, without lawful authority, a means of identification of another person,[1] in violation of 18 U.S.C. §§1028A(a)(1) and 2.

The case involved counterfeit debit/credit cards [coded with stolen numbers] used to purchase merchandise and gift cards from Target in South Florida in August 2009. The co-defendants' arrests on 8/12/09 came after a traffic stop by Officer Harrell. [Lawrence Benoit was driving; and the others were passengers]. The traffic stop led to discovery of physical evidence in the car, a pre-arrest statement to police by Liberal at the scene, and the making of a post-arrest/post-Miranda statement by Liberal at the police station. Dumervil moved to suppress evidence from the car (Cr:DE47), and Liberal adopted his motion, as did the defendants Benoit (Cr:DEs 53, 66, 67). After briefing, and argument including an evidentiary hear-ing (Cr:DEs 51, 52, 57, 76, 93) the Magistrate Judge recommended de-nial of the motion (Cr:DE78). After Liberal's objections (Cr:DE87), the District Court adopted the recommendation that the suppression motion be denied, upon findings that Officer Harrell's investigative stop was lawful, driver Lawrence Benoit voluntarily permitted search of the vehicle, and Harrell's inventory search of the car after the defendants' arrests was proper. (Cr:DE100).[2]

---

[1]     The specified "Means of Identification" were: Counts 4 and 5 [Debit card numbers, belonging respectively to CW and JF], counts 6-8 [Credit card numbers, belonging respectively to PI, VG and AI]; Counts 9-15, and 17 [Social Security numbers, belonging respectively to FTB, JS, KM, LM, JLS, RSF, AA, and EJ], and Count 16 [a Medicare Policy number, belonging to BB].

[2]     The record indicates that Officer Harrell had reasonable suspicion to initiate the traffic stop, based on his observation that the Nissan Altima in which they were riding was speeding, and appeared to have illegally tinted windows. He ran the plate for a stolen vehicle check. The car was not reported stolen, but the check indicated it was a rental car. Harrell's warrantless search of the Nissan was done pursuant to valid consent given by the driver, Lawrence Benoit, under circumstances that were not coercive [Harrell threatened noone, and

Liberal and Dumervil moved for dismissal of counts 4-17 because the alleged victims were identified therein only by initials; the motion was briefed, and, as urged by the government, the Court denied the motion; and a protective order was entered allowing the defendants to review unredacted discovery. (Cr:DEs 73, 75, 83, 94).

Then, on 11/23/09, Liberal filed a second motion (Cr:DE106), seeking to suppress statements on the night of his arrest, which he

---

did not unholster his weapon]. Using his police car's PA system, Harrell had told the driver to exit get out and approach the police car. Then, when informed that there were passengers, Harrell instructed them to get out and step away from the Nissan [so he could do a safety-based check for weapons, and test the window-tinting]. Through doors that were left open, Harrell smelled the odor of marijuana, and in plain view could see marijuana residue (seeds and stems) on the car seat. Harrell requested permission to search the car for drugs and weapons, and the driver verbally gave consent. Harrell looked inside and could see an envelope with the Target name on it, more marijuana [in a baggie behind the console], and could see two Visa credit cards [one on the center console, and one under a seat]. In the unlocked glove box, Harrell found Liberal's wallet. When Harrell opened the wallet to look for possible drugs [where he knew from past experience drugs are sometimes hidden/carried], he observed several pieces of ID not corresponding to Liberal, of which Liberal disavowed knowledge. Harrell asked the driver Benoit for permission to search the trunk, he voluntarily gave consent, and Harrell, using the ignition key, opened the trunk which disclosed Target bags, some jeans, a laptop computer, and two notebooks that were on top of some Jackson Memorial Hospital papers bearing patient ID information. Harrell meter-tested the windows, and two were too dark. He gave the driver two citations for the tinting violation. Upon Harrell's inquiry of the passengers about the drugs, Dumervil volunteered that the marijuana was his, and he was cuffed and arrested. Detective Caitlin [who was called as backup, and arrived "five, maybe ten minutes at most" after the traffic stop, and after the citations were issued] retrieved the Visa cards from inside the car, inspected them with a card reader, and found them to be re-encoded with credit card account numbers not corresponding to the numbers on the cards. Caitlin decided to arrest all the defendants for possession of fraudulent credit cards. The defendants were searched after arrest. Finally, pursuant to written NMBPD policy, the car was inventoried and towed. The Court found that Officer Harrell had reasonable suspicion to initiate the stop because he observed that the car going over the speed limit, and that it had windows that were too darkly tinted, and had probable cause to believe a traffic violation had occurred. Harrell's search of the car was found to be pursuant to valid consent by the driver, where the consent was voluntary, and not given under coercive circumstances. It also was found that Harrell acted properly in conducting an inventory search of the vehicle after the arrest of the defendants. Accordingly, the Court determined that the defendants' Motion to Suppress [Dumervil's motion, adopted by Liberal and other defendants, asking that the government be precluded from introducing evidence arising from the "illegal stop of the vehicle and search thereof"] should be denied.

had made pre-arrest at the scene of the traffic stop, and had made post-arrest/post-<u>Miranda</u> at the police station. The motion was briefed, and after a hearing, the Magistrate Judge recommended its denial, finding that the pre-<u>Miranda</u> statement on the street was voluntary and not the product of a custodial interrogation or its equivalent; and that the post-<u>Miranda</u> statement was voluntary, and given after a knowing and intelligent waiver of the defendant's rights. The District Court adopted the Magistrate's report and recommendation, and the motion was denied. (Cr:DEs 110, 118, 120).[3]

Ultimately, on the eve of trial, the Benoits both plead guilty.

---

[3]     The record indicates that when Harrell asked the three passengers to get out of the vehicle, they were told to sit behind it while he searched the car. It was while Liberal was seated there that he stated to Harrell that the wallet was his, but that he had no knowledge of pieces of identification inside that were not his. The record also indicates that later, after the 2 Visa cards from the car were determined at the scene to be fraudulent, Liberal was transported to the NMBPD and put in a holding cell. Later, at an interview room, Special Agent Dupree verbally advised Liberal of his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), while Liberal read them along with him, and agreed to waive each right. Liberal, who appeared nervous, but not agitated or intoxicated, and agreed to waive his <u>Miranda</u> rights. Liberal told Agent Dupree he was a college student. Liberal was not handcuffed, and Dupree did not have his weapon drawn, or make promises, or coerce or threaten him. Liberal gave a statement to Dupree indicating that he had obtained the credit cards from another individual.

The Court, citing cases, noted that <u>Miranda</u> safeguards come into play when a person in custody is subjected to express questioning, and that he/she is in custody for <u>Miranda</u> purposes only when there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. In regard to his pre-arrest statement at the scene of the traffic stop, the Court found that Liberal was not threatened, that Harrell's gun had not been drawn, and although Liberal and the other two passengers had been told to sit behind the car and were not free to leave [as Harrell began a safety-based search of the car for possible weapons], the pre-arrest statement made by Liberal to Harrell indicating the wallet was his, but he had no knowledge about the identification inside, was voluntary, under the totality of the circumstances was not the product of a custodial interrogation, or its functional equivalent, and should not be suppressed.

Regarding Liberal's post-<u>Miranda</u> statement at the police station, the Court noted that validity of a <u>Miranda</u> waiver depends on the particular circumstances of the case, including background and experience of the accused, and whether the defendant was properly advised of and understood his rights, and voluntarily agreed to give a statement to police. The Court found Liberal was properly advised of and understood his <u>Miranda</u> rights, was not coerced, and voluntarily agreed to provide the statement he gave to police, and that it should not be suppressed.

Jury selection began on 12/7/09. The jury reached its verdicts on 12/14/09. Liberal was found innocent on Counts 3 and 7-17, and guilty as charged on counts 1, 2, 4, 5 and 6 (Cr:DEs 149, 155). Dumervil was acquitted on all charges (Cr:DEs 151, 156).

After filing and briefing of his objections to the PSI, and his 3/8/10 sentencing (Cr:DEs 162, 167, 187), the Court imposed a sentence of 60 months imprisonment upon Liberal, consisting of: concurrent 18-month terms on Counts 1 and 2; a 24-month term on Count 4, to run consecutively with Counts 1 and 2; and concurrent 24-month terms on Counts 5 and 6, 18 months of which run consecutively to the terms imposed on Counts 1, 2 and 4. (Cr:DEs 216, 220).

For purposes of appeal Liberal was appointed new counsel, he filed notice of appeal (Cr:DEs 180, 190), and then voluntarily dismissed his appeal #10-11149-EE on 7/9/10 (Cr:DE228). Liberal's §2255 Motion to Vacate (consisting of Cv:DEs 1 and 4 together) is treated as filed on 10/15/2010.[4] It clearly was filed less than a year after his judgment became final, regardless of whether the judgment is deemed to have become final upon dismissal of Liberal's appeal on 7/9/10, or 90 days later on or about 10/17/10.[5] The §2255 Motion

---

[4]      A judgment was entered 3/8 and docketed 3/9/10 (CR:DE193); an Amended Judgment was entered and docketed 3/23/2010 [due to correction of forfeiture order](CR:DE201); and a Second Amended Judgment was entered 5/6/10 and docketed 5/11/10 [due to modification of restitution order] (CR:DE220).

       Liberal's §2255 motion is deemed to consist of two documents (both file stamped and docketed on 10/12/10): the standard §2255 form (Cv:DE1) which is unsigned and undated (see Cv:DE1, p.15), together with Liberal's Memorandum (Cv:DE4) which is signed/dated 10/5/10 (see Cv:DE4, p.14) and contains a Certificate of Service (Cv:DE4, p.17), also signed/dated 10/5/10, stating "I have served a true and correct copy of the following: Motion Under 28 U.S.C. §2255 To Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody," and that the §2255 motion was tendered to prison authorities for mailing on 10/5/2010.

[5]      While the conviction of a defendant who takes no direct appeal becomes final when the 10-day period for appealing has expired, exclusive of intervening weekends, see Adams v. United States, 173 F.3d 1339, 1342 n.2 (11 Cir. 1999); Mederos v. United States, 218 F.3d 1252, 1253 (11 Cir.2000); Fed.R.App.P. 4(b)(1)(A)(I) and 4(b)(6); Fed.R.App.P. 26; the conviction of a federal defendant

therefore was filed within the 1-year limitations period allotted by The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),[6] and is timely.

---

who appealed, becomes final only after the appellate court's ruling is entered, and the 90 day period for seeking *certiorari* review in the Supreme Court has expired, or when *certiorari* is denied [if a petition for *certiorari* was filed]. See Griffith v. Kentucky, 479 U.S. 314, 321, n.6 (1986); Close v. United States, 336 F.3d 1283 (11 Cir.2003); United States v. Kaufmann, 282 F.3d 1336 (11 Cir.2002); Sup.Ct.R. 13. Here, although the Eleventh Circuit has not addressed the issue of when a conviction becomes final if a federal defendant's direct appeal is voluntarily dismissed, it appears that Movant Liberal's judgment should be treated as having become final 90 days from the date [7/9/10] when his appeal was voluntarily dismissed. Reasoned District Court decisions in this Circuit, in the §2255 and 2254 contexts, suggest that it is correct to treat a district court judgment, followed by voluntary dismissal of a direct appeal, as being final 90 days after the voluntary dismissal [the time by which the appellant must have sought a petition for writ of *certiorari* if he/she had wished to do so]. See United States v. Reed, Nos. 3:08cr20/MCR, 3:09cv576/MCR/EMT, 2011 WL 2038627, at *3-4 (N.D.Fla., Apr. 4, 2011) (case in which the Magistrate Judge, in a reasoned report, recently noted that an argument that a defendant who voluntarily dismisses his appeal should have no reason to file a petition for writ of *certiorari*, that is not the same as saying that he/she is legally foreclosed from doing so. Accordingly the Judge concluded that the defendant/§2255 Movant Reed's conviction did not become final until the 90 day period for his filing a petition for writ of certiorari expired. *Cf* Brandon v. McNeil, 2009 WL 559530, at *3-4 (N.D.Fla., Mar. 4, 2009)(stating it appears that generally a petitioner does in fact have ninety days to file a petition for writ of *certiorari* in the United States Supreme Court after a *dismissal* of a direct appeal in that the dismissal is deemed a judgment); Chapman v. McNeil, No. 3:08cv5/LAC/EMT, 2008 WL 2225659, at *1 (N.D.Fla., May 28, 2008) (adopting report and recommendation which concluded that a state conviction become final, for AEDPA purposes, 90 days after the state appellate court granted prisoner's motion for voluntary dismissal of his appeal).

[6]     Under 28 U.S.C. §2255, as amended April 24, 1996, a 1-year period of limitations applies to a motion under the section, and runs from the latest of:

(1)     The date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(2)     The date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant is prevented from filing by such governmental action;

(3)     The date on which the constitutional right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4)     The date on which the facts supporting the claim or claims could have been discovered through the exercise of due diligence.

## II   MOVANT'S CLAIMS/GROUNDS FOR RELIEF

Movant Liberal's claims are framed in terms of 10 Grounds for relief in the §2255 form (Cv:DE1). Giving consideration to his statements/allegations in his supporting memorandum (Cv:DE4), the claims raised in the §2255 form, are essentially, as follow:

Trial Counsel's representation was ineffective, as a result of the following errors/omissions:

**GROUND 1**   **Counsel failed to call Liberal to testify at his suppression hearing.** (Liberal asserts he was led to believe he would be called to testify at the suppression hearing, but was not called as a witness; and asserts he would have testified that the car was not speeding, and the traffic stop was pretextual, as only citations for illegal window tinting were issued, and no speeding ticket was given).

**GROUND 2**   **Counsel failed to move to suppress Liberal's statement to Agent Dupree, on grounds that he was intoxicated when he gave it.**

**GROUND 3**   **Counsel failed to properly investigate the facts:**

**1.   by failing to contact Stevenson and Lawrence Benoit as "potential witnesses," concerning facts surrounding the traffic stop, which facts** (as now proffered by the Benoits in their Affidavits submitted by Movant Liberal in this §2255 proceeding) **would have served to impeach testimony of Officer Harrell**

**a.**   since counsel already had photos of the interior of the car, showing it had a push-button start system, and no keys in the ignition; and the Benoits would have corroborated this if called to testify;

**b.**   where the Benoits' testimony would have shown that Officer Harrell was lying, because they would have testified that the Nissan was not speeding; that the Nissan in fact was traveling behind Harrell, who then changed lanes, slowed his patrol car, allowed the Nissan to go by, then followed it for several minutes, and only

---

See 28 U.S.C. §2255(f).

then made the traffic stop;

2.   **by failing to obtain a recording of the police dispatch, which could have helped impeach Officer Harrell,** where Harrell testified at the suppression hearing that it took Detective Caitlin 5 or 10 minutes to arrive, but at trial testified that it took Caitlin 5-6 minutes to arrive; and

3.   **by failing to investigate the amount of drugs consumed by Liberal** (where the Benoits' affidavits indicate that before the traffic stop the 4 men had smoked ½ ounce of marijuana and used air freshener to cover the odor).

GROUND 4   **Counsel did not allow Liberal to testify at trial on his own behalf.** (Movant asserts he would have addressed questionable aspects of the case, including whether he had actual knowledge "of additional cards found in his wallet that belonged to co-defendant Stanley Dumervil," and whether Harrell's car was headed westbound or stationary when the Rental Car was eastbound; and he asserts that he would have testified that he "had no knowledge that he was using unauthorized access devices belonging to another person," that he "would have testified that all these cards had his name on them and were ordered through the mail," and that "he would have rebutted the officer's testimony that he knew the cards were re-coded.")

GROUND 5   **During his direct examination Officer Harrell was allowed to correct a misstatement in his testimony, and offer an explanation that his error occurred because he had gone 24 hours without sleep; and Movant Liberal alleges that counsel was ineffective for not objecting to the explanation that Harrell had been awake for 24 hours before testifying, because it was "a way to extract sympathy from jurors and bolster [the] officer's testimony, even when it was clear he had been impeached."**

GROUND 6   **Counsel during closing argument conceded Liberal's guilt.**

GROUND 7   **Counsel failed to contact and subpoena Stevenson Benoit [who admitted his own guilt] as a potential witness** (to testify that Liberal "had no knowledge of anything concerning the credit cards, nor of anything in the trunk of the rental vehicle").

GROUND 8   **Counsel should have called a toxicologist as an expert witness at the suppression hearing, and at trial, who "could have testified" that at the time of his statement at the police station Liberal was intoxicated** (and could also have testified

8

that the statement given during a 20-minute interview, conducted some 7 hours after the traffic stop, was coerced, where Liberal had been awake for 24 hours, without food, was confused and scared).

**GROUND 9**    **Counsel's alleged errors had a cumulative effect, which denied Movant a fair trial.**

**GROUND 10**    **Counsel failed to preserve an issue for appeal, when he did not object to the explanation that Harrell had been awake for 24 hours, when it was offered as an excuse for earlier "misstatements or contradictory facts."**

## III    DISCUSSION

Liberal's claims, couched as claims of ineffective assistance, are subject to the two-part test enunciated in Strickland v. Washington, 466 U.S. 668 (1994), which is not a favorable standard to the movant. See Massaro v. United States, 538 U.S. 500, 505 (2003). To prevail, a movant must demonstrate both that (1) counsel's performance was deficient, meaning that it fell below an objective standard of reasonableness; and (2) the deficient performance prejudiced the defendant. Chandler v. United States, 218 F.3d 1305, 1312-13 (11 Cir. 2000)(en banc), cert. denied, 531 U.S. 1204 (2001); Strickland, supra. A habeas court's review of a claim under the Strickland standard is "doubly deferential." Knowles v. Mirzayance,__ U.S. __, 129 S.Ct. 1411, 1418, 173 L.Ed.2d 251 (2009).

In deciding whether counsel's performance was deficient, judicial scrutiny is "highly deferential" and requires us to "'indulge [the] strong presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment.'" Chandler, supra, 218 F.3d 1314 (quoting Strickland, supra, 466 U.S. at 689-90. The Eleventh Circuit will not "second-guess counsel's strategy." Chandler, 218 F.3d at 1314, n.14. Strategic choices, even those "made after less than complete investigation," are evaluated for their reasonableness and

"counsel's reliance on particular lines of defense to the exclusion of others--whether or not he investigated those other defenses--is a matter of strategy and is not ineffective unless the petitioner can prove the chosen course, in itself, was unreasonable." Chandler, 218 F.3d at 1318 (quoting Strickland, 466 U.S. at 690-91).

The courts "are not interested in grading lawyers' performances;" but rather, "are interested in whether the adversarial process at trial ...worked adequately." Rogers v. Zant, 13 F.3d 384, 386 (11 Cir. 1994)(quotation marks omitted). To be unreasonable, the performance must be such that "no competent counsel would have taken the action that [the petitioner's] counsel did take." Grayson v. Thompson, 257 F.3d 1194, 1216 (11 Cir. 2001)(emphasis omitted). In other words, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." Rogers, supra, at 386. Under the second prong of the Strickland test, the petitioner can be said to have been prejudiced by counsel's performance only if there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is probability sufficient to undermine confidence in the outcome." Strickland, supra, at 694.

Counsel has no duty to raise defenses which have little or no chance of success. Knowles, supra, 129 S.Ct. at 1422 (the law does not require counsel to raise every available non-frivolous defense). See generally, Chandler v. Moore, 240 F.3d 907, 917 (11 Cir. 2001)(counsel is not ineffective for failing to raise non-meritorious objection); Card v. Dugger, 911 F.2d 1494, 1520 (11 Cir. 1990) (holding that appellate counsel is not required to raise meritless issues); Matire v. Wainwright, 811 F.2d 1430 (11 Cir. 1987) (same). Bare, conclusory allegations of ineffective assistance of counsel which contradict the existing record and are unsupported by af-

fidavits or other indicia of reliability, are insufficient to re-
quire a hearing or further consideration. <u>United States v. Robinson</u>,
64 F.3d 403, 405 (8 Cir.1995), <u>Ferguson v. United States</u>, 699 F.2d
1071 (11 Cir. 1983), <u>United States v. Ammirato</u>, 670 F.2d 552 (5
Cir.1982); <u>United States v. Sanderson</u>, 595 F.2d 1021 (5 Cir.1979).

## Claims Relating to Suppression

### GROUND 1

Liberal is not entitled to relief on his claim that counsel
failed to call him to testify at his own suppression hearing. While
a defendant has a right to testify at trial, which cannot be waived
by counsel, <u>Gallego v. United States</u>, 174 F.3d 1196, 1197 (11 Cir.
1999); <u>United States v. Teague</u>, 953 F.2d 1525, 1532 (11 Cir. 1992),
the courts have held that the right to be present at every stage of
trial does not does not confer upon a defendant the right to be pre-
sent at every pretrial hearing, <u>see</u> <u>United States v. Pepe</u>, 747 F.2d
632, 653-54 (11 Cir. 1984), noting that in both <u>United States v.</u>
<u>Gradsky</u>, 434 F.2d 880, 882-83 (5 Cir. 1970), cert. denied, 409 U.S.
894 (1971), and <u>Yates v. United States</u>, 418 F.2d 1228 (6 Cir. 1969),
the courts of appeal found no error in the trial court's exclusion
of the defendant from a pretrial suppression hearing at which evi-
dence was taken. It follows that if Liberal had no Sixth Amendment
right to be present at his suppression hearing, counsel cannot have
been ineffective for failing to call him as a witness. Moreover, it
does not appear that Liberal can demonstrate prejudice under prong
two of <u>Strickland</u>, where the arresting officer Harrell's testimony
regarding the basis for the traffic stop was challenged by defense
counsel on cross-examination, first by Dumervil's attorney, Mr.
Casuso, and then by Liberal's attorney, Mr. Levin. Attorney Levin,
following up on Mr. Casuso's questioning of Harrell about the speed
and window tinting of the Nissan, and his determination that it was
a rental car (Cr:DE93, T/27-29), sought to challenge Harrell's
testimony, with additional questions regarding location of his
police car (in a turn lane at 11th Avenue) and direction it was

facing (West), the Nissan's speed (49 in a 35 zone) and direction (Eastbound), and Harrell's failure to issue a speeding ticket. Mr. Levin also questioned the extent of Harrell's opportunity to observe the widow tinting (2 or 3 seconds) as the Nissan passed him, while it was dark and there was street light illumination, and then check and determine that the Nissan was a rental car before it was stopped, at 18th Avenue (Cr:DE93, T/33-37). In sum, where counsel at the first suppression hearing challenged Officer Harrell regarding the points on which Movant Liberal now states he would have given testimony if he had been called as a witness, it does not appear that counsel was ineffective for failing to call Liberal to testify. Further, it appears that Movant Liberal's testimony, if he had been called by Mr. Levin at the suppression hearing, would have been cumulative; and the record does not suggest that the court's ruling on the suppression motion would have been different had Liberal testified. In sum, Movant Liberal has not shown prejudice resulting from that alleged deficient performance, and accordingly he does not satisfy the second prong of the <u>Strickland</u> test, even if it were assumed that he had a right to testify at the suppression hearing.

**GROUNDS 2 AND 8, and the 3rd Sub-claim of Ground 3**

In <u>Ground 2</u>, Liberal argues that counsel should have moved to suppress his statement to police on grounds he was intoxicated by marijuana; and in <u>Ground 8</u> he argues that counsel should have called a toxicologist to testify, because he/she could have offered an expert opinion that Liberal was intoxicated. As a sub-claim of <u>Ground 3</u> Liberal (citing affidavits attached to his Memorandum) argues that, where the defendants Benoit state their past and present willingness to testify, defense counsel should have investigated and called them to testify about the four co-defendants' marijuana use on the night of the traffic stop.

Against the background of testimony at the November 2009 suppression hearing indicating that Harrell through open car doors had

12

smelled the odor of marijuana when the Nissan was stopped, and that
it was Dumervil who had claimed ownership of and had been arrested
for the marijuana found in a bag in the car, Defense Attorney Levin
engaged in cross-examination of Harrell, which explored the length
of time and circumstances of Harrell's interaction with Liberal at
the scene of the traffic stop/arrest, and Liberal's statement given
there to Harrell disavowing knowledge of cards observed in his
wallet,[7] after Harrell had asked Liberal if he had his ID in his
wallet. (Cr:DE159, T/14-22). Thereafter, Agent Dupree testified
regarding the circumstances of Liberal giving a statement at the
police station (Id, T/23-33), and attorney Levin cross-examined
Dupree, striving to demonstrate and to convince the court that
defendant Liberal's statement was the product of coercive
circumstances, in that he had been held at least 7 hours, in a small
room with a concrete bench, and was nervous. Counsel asked Dupree
if Liberal smelled of alcohol or marijuana, and he said no. Levin
then elicited Dupree's response that he had not asked Liberal if he
had been using those substances. Counsel asked whether the interview
room had windows, and asked if Liberal was in restraints when Dupree
spoke with him. He also asked whether Liberal was told that by
giving a statement he might be making it easier on himself, and
whether it was suggested to Liberal, directly or indirectly, that
what he said would be presented to the U.S. Attorney's Office and
that he might benefit.

In sum, counsel did seek to establish that Liberal's inculpa-
tory statement at the police station was not voluntary. The fact
that Attorney Levin pursued certain arguments, and asked certain
questions in an attempt to show that Liberal's statement should be
suppressed, and that counsel did not pursue an alternative argument

---

[7]     As noted supra, this denial was found by the court to be a
voluntarily made non-custodial statement. (It is further noted that it was during
Harrell's safety-based search of the car for weapons that the wallet had been
found in the car's unlocked glove compartment, and when Harrell asked whose
wallet it was, Liberal had claimed ownership).

(i.e., that Liberal's statement should be suppressed because he had been intoxicated; and did not seek expertise of a toxicologist and/or seek to call Lawrence and Stevenson Benoit as witnesses), was apparently a matter of strategy, and clearly was reasonable, where the record indicates that Dumervil initially was arrested for having claimed the marijuana was his; where a period of 7 hours or more had passed between the time of the traffic stop and the time that Liberal was Mirandized, and Liberal at that time did not seem to Dupree to be under the influence of liquor or marijuana. It was also reasonable, where, even if the convicted co-defendants Benoit were willing to testify, they would have been subject to rigorous cross-examination, and their credibility would have been questioned. It does not appear that Liberal can show Attorney Levin's representation fell below the objective standard of reasonableness, and that no reasonable attorney, under the circumstances, would have chosen not to argue intoxication as a basis for the suppression motion. See Dorsey v. Chapman, 262 F.3d 1181, 1186 (11 Cir. 2001) (holding petitioner did not establish ineffective assistance based on defense counsel's failure to call expert witness, in that counsel's decision to not call the expert witness was not so patently unreasonable a strategic decision that no competent attorney would have chosen the strategy); Strickland, supra, 466 U.S. at 690-91 ("strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation").

### Other Claims of Failure to Investigate And Failure to Call Witnesses

**GROUNDS 3 AND 7**

In the first sub-claim of Ground 3, Liberal argues that to impeach Officer Harrell, counsel should have called the Benoits to testify that the Nissan was not speeding, and that it had push-button start and needed no key for the ignition. [Suppression hearing testimony by Harrell indicated that he took a car key, which he be-

lieved was in the ignition, and used it to open the trunk (Cr:DE93, T/16, 52), and that radar showed the car was going 49 mph in a 35 mph zone (Id., T/27-28)]. In sub-claim two of Ground 3, Liberal argues that to help impeach Harrell counsel should have obtained a police dispatch record, to underscore discrepancies in his testimony about when backup Officer Caitlin arrived at the scene of the traffic stop [5-10 vs. 5-6 minutes]. In Ground 7, counsel is alleged ineffective for not calling Stevenson Benoit to testify that Liberal had no knowledge of credit cards or of things in the trunk.

To support his argument that the co-defendants Benoit should have been subpoenaed to testify, Liberal offers their aforementioned Affidavits (at Cv:DE4, pp. 16, 17) stating their willingness and availability to testify[8] about the Nissan's speed, and its starter system and key. To attack the convictions [conspiracy, and other counts], Liberal offers Stevenson Benoit's Affidavit stating that Liberal lacked knowledge of the items in the car trunk, the contents of the computer, that Liberal was just "taking a ride with us," and that on 8/12/2009 at the Target store he had given Liberal permission to use his credit card, and that Liberal did not know it was altered or that its code was tampered with when he borrowed it.

Decisions whether to call a particular witness or cross-examine certain witnesses are generally questions of trial strategy. See Dorsey v. Chapman, supra, 262 F.3d at 1186; United States v. Costa, 691 F.2d 1358 (11 Cir. 1982). Where counsel failed to investigate and interview promising witnesses, and therefore "ha[s] no reason to believe they would not be valuable in securing [defendant's] release," counsel's inaction constitutes negligence, not trial stra-

---

[8]     See Lawrence Benoit's 6/21/2010 Affidavit at ¶7 stating: "Affiant told Whitney Liberal that he was available to testify at trial, and is available now and anytime, but until this day has not been called to give testimony to the above related facts of the case." See Stevenson Benoit's 6/21/2010 Affidavit at ¶7, stating: "Affiant waited to be called to testify, to no avail. I am willing to give testimony and am available at any time to come to court to attest to the above stated facts of the case."

tegy. <u>Workman v. Tate</u>, 957 F.2d 1339, 1345 (6 Cir. 1992)(<u>quoting</u> <u>United States ex rel. Cosey v. Wolff</u>, 727 F.2d 656, 658 n.3 (7 Cir. 1984)). Nevertheless, strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable. <u>Strickland</u>, <u>supra</u>, at 690-91. Failure to present mitigation evidence through co-defendants' testimony does not necessarily amount to ineffective assistance, where a decision not to do so would constitute reasoned trial strategy.[9] Here, it is apparent that a decision by defense attorney Levin to not call the Benoits as witnesses was a reasonable tactical decision made as part of trial strategy, where they certainly would have been subject to rigorous cross examination that could have been damaging to his client, and counsel most certainly would take into consideration that the Benoits had both plead guilty and were convicted of offenses in the case on 12/4/2009 (Cr:DEs 130-137) before commencement of Liberal's trial, thereby likely affecting their credibility as witnesses in the eyes of the jury. While Mr. Levin did not call Liberal's co-defendants as witnesses, and apparently did not obtain a police dispatch log to determine precisely when Officer Caitlin arrived,[10] he did subject Officer Harrell to cross-examination cov

---

[9]     <u>See</u> <u>Jones v. Campbell</u>, 436 F.3d 1285, 1294 (11 Cir. 2006)("Counsel's complete failure to present mitigation evidence does not necessarily constitute deficient performance, even if mitigation evidence is available")(quoting <u>Putnam v. Head</u>, 268 F.3d 1223, 1244 (11 Cir. 2001); <u>Waters v. Thomas</u>, 46 F.3d 1506, 1512 (11 Cir. 1995)(en banc)("Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we seldom, if ever, second guess.").

[10]     As discussed in the Report, Attorney Levin's cross examination of Officer Harrell served to question his powers of observation and veracity of his testimony.
        Liberal does not show, and the record does not suggest that not obtaining a police dispatch record would have made a difference. [Harrell at the pre-trial suppression hearing said the process of having the occupants exit from the vehicle, and checking the vehicle, took "probably 10 minutes, maybe less" (Cr:DE93, T/44) and testified that shortly after he had the men on the side of the road he requested Catlin, and that Catlin had arrived in "five, ten minutes at most." (<u>Id.</u>). At trial, Harrell testified that after his [Harrell's] search of the vehicle, officer Catlin, who had expertise in the area of fraud, arrived at the scene, and checked cards that had been found to see if they were valid. (Cr:DE211, T/128); and at trial Harrell testified that he had started his search of the car "five minutes or so"..."plus or minus" after the car was pulled over

ering a number of matters about which Liberal contends the Benoits could have offered testimony. (Cr:DE211, T/149-162). Mr. Levin's examination of Harrell was clearly intended to undermine Harrell's credibility, while simultaneously suggesting to the jury Liberal's innocence or lack of involvement.[11]

Moreover, it must be noted that the Benoits' Affidavits, are highly suspect, given the Affiants' relationship to Liberal in the underlying criminal case, and given the timing of the preparation and presentation of the affidavits. The Benoits' affidavits were executed on 6/21/10, about 6 months after their pleas (Cr:DEs 130-131, 134-135) and 3 months after their March 2010 sentencings (Cr:DEs 188-189), in preparation for Liberal's filing of his October 2010 §2255 motion. Although the Benoits' affidavits suggest they were available to testify at trial if called to do so, in an attempt to exonerate their co-defendant Liberal, it is not clear that they would willingly have done so at that time, because the Benoits' pleas were entered on 12/4/09, just days before Liberal's trial commenced, the Benoits' PSIs had not yet been prepared, their sentencing would not take place until 3 months later, and under terms of the Benoits' plea agreements, the making of false state-

---

(Cr:DE211, T/162)].

[11]    Attorney Levin's examination served to question propriety of the traffic stop, eliciting Harrell's admission that he issued no speeding ticket despite his contention that the Nissan was speeding; and where Harrell contended that the main reason he stopped the car was that the window tinting was too dark, Mr. Levin questioned Harrell's ability make that determination as it was night-time and the Nissan had gone speeding by him. Mr. Levin elicited Harrell's testimony that Lawrence Beniot had claimed ownership of items in the car trunk, and Harrell's testimony that fingerprint and handwriting analysis was not conducted on those items. He elicited Harrell's testimony surrounding the discovery of Liberal's wallet, including that apart from a driver's licence (learner's permit) which Liberal said was in his wallet, Liberal denied knowledge of other cards which Harrell said were found inside of it, and that when Liberal was questioned by Harrell at the scene of the traffic stop he was cooperative, and did not try to hide anything. He also elicited Harrell's testimony that his search of the car was conducted within 5 minutes or so of the time he stopped it. (Id. T/149-162).

ments or misrepresentations by them could possibly affect their sentencing.[12]

Courts have held that the self-serving presentation of affidavits such as those relied upon here by the Movant Liberal is to be viewed with extreme suspicion. See Drew v. Scott, 28 F.3d 460, 462-63 (5 Cir.), cert. denied, 512 U.S. 1266 (1994)("we still have little confidence in [the codefendants'] postsentencing truth experience because he had nothing whatsoever to lose by incriminating himself after receiving a 60-year sentence"; rejecting the state prisoner's "new evidence" in the form of recently-obtained statement of a third prisoner claiming that he heard the codefendant take sole credit for the murder before he pled guilty to that murder); United States v. Vergara, 714 F.2d 21, 23 (5 Cir. 1983)(holding that the district court may deny the defendant a new trial, without an evidentiary hearing, if it determines that a previously silent accomplices's postconviction willingness to exculpate his codefendant is not credible); Drew v. State, 743 S.W.2d 207, 228 (Tex.Crim.App. 1987)("It is not unusual for one of two convicted accomplices to assume the entire fault and thus exculpate his codefendant by the filing of a recanting affidavit or other statement."). See also May v. Collins, 955 F.2d 299, 314 (5 Cir. 1992) and cases cited therein, cert. denied, 504 U.S. 901 (1992)(when faced with recanting affidavits, trial court may make credibility choice in favor of trial testimony without taking additional live testimony).

---

[12] Their plea agreements provided that the U.S. Attorney's Office reserved the right to inform the Court and Probation Office of all facts pertinent to the sentencing process. The agreements further provided that anticipated government recommendation for credit adjusting the defendants' offense levels downward under Guidelines Section 3E1.1 was contingent upon full, accurate, and complete disclosure to the Probation Office of the circumstances surrounding the relevant offense conduct, and that the  government would not be required to make the recommendation if the defendant was found to have misrepresented facts to the government prior to entering into the agreement, or if the defendant were to commit any misconduct after entry into the agreement, including but not limited to committing any state or federal offense...or making false statements or misrepresentations to any governmental entity or official. (See Cr:DEs 131 and 135).

In _Schlup v. Delo_, 513 U.S. 298 (1995), the Supreme Court instructs that the court must "assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial." _Id._, 513 U.S. at 332. As part of this analysis, "the court may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." _Id_.   To the extent that Movant Liberal here appears to be attempting to establish "actual innocence," to do so he must meet a high standard. _Bousley v. United States_, 523 U.S. 614 (1998). He must demonstrate that "in light of all the evidence, 'it is more likely than not that no reasonable juror would have convicted him.'" _Bousley_, _supra_ at 623, _quoting_, _Schlup v. Delo_, 513 U.S. 298, 327-328 (1995). The Court emphasized that actual innocence means factual innocence, not mere legal insufficiency. _Id_. _See also_ _High v. Head_, 209 F.3d 1257 (11 Cir. 2000); _Lee v. Kemna_, 213 F.3d 1037, 1039 (8 Cir.2000); _Lucidore v. New York State Div. of Parole_, 209 F.3d 107 (2 Cir. 2000)(citing _Schlup v. Delo_, 513 U.S. 298, 299, (1995); _Jones v. United States_, 153 F.3d 1305 (11 Cir. 1998)(holding that appellant must establish that in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him). To be credible, a claim of actual innocence requires the petitioner to "support his allegations of constitutional error with new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial." _Schlup_, _supra_, 513 U.S. at 324. All things considered, the evidence must undermine the Court's confidence in the outcome of the trial. _Id_. at 316.

Here, Liberal's contention that attorney Levin was ineffective for reasons asserted in the present claims, and any suggestion that he might be actually innocent, overlook evidence of conspiracy, fraud, and identity theft adduced at trial. During the consensual search of the car, numerous re-encoded cards, patient hospital records, and notebooks with stolen social security and bank account

numbers and passwords were found. In the trunk there also was the laptop computer and data storage device, the contents of which were searched after issuance of a warrant, leading to discovery of a "Mission Statement," and scores of files containing credit reports, addresses, and other personal information of victims. Liberal had admitted in his post-<u>Miranda</u> statement at the police station that several re-encoded debit cards used by him on the night of his arrest, some of which were in his wallet, were his. In addition, there were damning synchronized video and cash register records from Target stores, introduced through testimony of Johnson Chin, the Target Store Investigator, depicting individuals making purchases. Some of the video/register records depicted attempted purchases and completed purchases being made by a man, who Investigator Chin identified in Court as being defendant Liberal. (<u>See</u> Cr:DE211, T/20 et seq.). Specifically, this evidence which directly implicated Liberal, involved his use/attempted use of the very counterfeit cards (ending in #s 7014, 5010 and 0217) which formed the basis for charges against Liberal in the Indictment (<u>see</u>, Indictment, "Acts In Furtherance of The Conspiracy," Cr:DE31 at p.2; and <u>see</u> Indictment, Counts 4, 5 and 6, at CR:DE31, p.5).[13]

　　　　In sum, counsel's errors alleged in these claims, in particular

---

[13]　　Chin, through the video and register records, offered testimony demonstrating that Liberal, on 8/11/09 at 8:46 p.m. at register 92, first tried to buy a $200 gift card with a MasterCard ending in #0217, which was declined, and then successfully used another MasterCard ending in #5010 to purchase it. Next, on 8/11/09, at 8:50 p.m., at register 111 in the electronics department of the same store, video showed Liberal with two Wii systems [each worth $264.99], first trying to purchase one of them with the MasterCard ending in #5010, which was declined, and then successfully making the purchase using a MasterCard ending in 7014. Finally, starting at 8:51 p.m., the store records showed Liberal trying to purchase the second Wii system that he had put on the counter, by swiping MasterCards ending in #6255, 7014, 5010, all of which were successively declined. He then presented the $200 gift card he had bought using MasterCard #5010, and it was accepted, leaving a $64.99 balance that had to be covered to complete the purchase. To cover it Liberal tried to use the MasterCard ending in #0217, and a MasterCard ending in #6255, and then tried to use the MasterCard ending in 7014, all of which were declined. Then, when the incomplete transaction was voided, the cashier refunded the $200 back onto the gift card, and handed it to Liberal, who then left the area at about 8:54 or 8:55 p.m. (Cr:DE211, T/55-61).

the alleged failure to call the Benoits as witnesses (a matter of trial strategy, that was reasonable under circumstances of the co-defendants' cases), cannot be said to have amounted to ineffective assistance, and counsel's decision should not be second-guessed.

Insofar as Liberal appears to be attempting to link his ineffective assistance claims to an assertion of actual innocence, defense attorney Levin [as noted in discussion of ground 5, below], did elicit testimony from Officer Harrell that Stevenson Benoit said the contents of the car trunk were his [and Benoit, who was the renter of the car, alternatively had said to Harrell that the computer and notebooks were in the car when he rented it]. Liberal's claims of innocence, however, are undermined by Agent Dupree's testimony that Liberal in his Post-Miranda statement at the police station had admitted having in his wallet credit cards that he knew were re-encoded by another person [and stating that Liberal told him they had previously investigated the man "for the same thing," and that his name was David Taylor] (Cr:DE212, T/91-98), and are further undermined by the previously discussed evidence, introduced through testimony of Target Investigator Chin, showing Liberal's possession and use of certain cards, with numbers listed in the Indictment.

Under 28 U.S.C. §2255, relief is available in a limited number of cases to prevent constitutional injustice or other fundamental miscarriage of justice. United States v. Segler, 37 F.3d 1131, 1133 (5 Cir. 1994). One basis for a showing of entitlement to relief is a showing of actual innocence. Here, where the Movant Liberal's claim of actual innocence is couched in terms of ineffective assistance, but he cannot establish actual innocence because the record supplies overwhelming evidence of his culpability, he is entitled to no relief, and no hearing is required. See Bousley v. United States, supra; Jones v. United States, supra; Kight v. Singletary, 50 F.3d 1339, 1547, n.21 (11 Cir. 1995); Luster v. United States, 168 F.3d 913, 915-16 (6 Cir. 1999); Baker v. United

States, 781 F.2d 85, 92 (6 Cir. 1986).

**GROUND 4**

In Ground 4, Liberal claims that counsel did no allow him to testify at trial. While a defendant has a right to be present and testify at his own trial, which cannot be waived by counsel, see Teague, supra, 953 F.2d at 1532; Gallego, supra, 174 F.3d at 1197; here the Movant Liberal cannot prevail on his claim. As related in the government's response (Cv:DE8, pp. 4-6), and reflected in the trial record, the Court engaged in two separate colloquies with the defendant/Movant, the first prior to conclusion of the government's presentation of its case (Cr:DE213, T/17, 19-26), and the second (at Cr:DE213, T/83), after the government had rested at the close its evidence (Id. T/75). During the first colloquy, the Court reminded Liberal that the day before it had told him it was going to conduct a colloquy about his right to testify, and that, although it was now conducting the colloquy and discussing the matter with him, the court would be allowing him to wait until he had heard all of the government's evidence before making the ultimate decision. (T/17). The Court, questioned Liberal, who was under oath, to determine his competence and experience. In answer to the Court's questions he said he was 19, had attended Junior College in liberal arts for a semester, that he had not ingested anything including food, beverages, prescription medications, drugs, or alcohol, in the prior 24 hours that would affect his ability to understand the court proceedings. Liberal said that once before, in California, he had had an attorney. The Court explained to Liberal that although Mr. Levin had years of experience that served to benefit him, it was his life, he did not have to take the advice of his lawyer, and ultimately the choice of whether to testify was his. Liberal stated that he understood. Liberal confirmed his understanding that he had the right under the Fifth Amendment to be a witness in his own defense, and that he also had the right to remain silent. He further affirmed his understanding that if he chose to testify, the Court would

22

include in the jury packet an instruction that "they have to treat you the same way as they would any other witness in evaluating your credibility." The Court discussed the question of priors, and explained that if he had just an arrest, it wouldn't come out; and Liberal further stated his understanding that if he decided not to testify, the government would not be permitted to argue that he was trying to hide something, and that the jury would be instructed that they could not use his decision to remain silent in any way against him or consider it in their deliberations. The Court cautioned that if he chose to testify, and turned out to be "a lousy witness," or if the jury didn't believe him for whatever reason, he couldn't later complain about the decision; and cautioned alternatively, that if he decided not to testify, he could not later complain and say, "If they jury had only heard from me and heard what really happened things would have been different." Liberal stated that he under-stood. (T/19-26). Liberal stated he had discussed the pros and cons of testifying with his attorney; and when asked if he wanted to make his decision at that juncture (T/26) he said he would wait (T/26). Subsequently, the Court asked defendant Liberal's attorney if he was going to put on any evidence, and in Liberal's presence, Attorney Levin stated, "No, Your Honor." The Court asked, "So your are just going to stand and rest?," and Mr. Levin said, "Yes." The Court then turned to defendant Liberal and addressed him, directly, conducting the second, brief colloquy. Liberal was reminded of what had been discussed earlier, about his right to testify. He reaffirmed his understanding of the right, and when asked by the Court if he had "made a decision," Liberal stated, under oath, "Yes. I have come to the decision that I am not going to testify." (Id. T/83).

Here, given his statements made to the Court under solemn oath, that it was his personal decision not to testify, after consultation with counsel, Liberal should not be heard to raise a belated complaint in this collateral proceeding, that counsel was ineffec-tive for allegedly not allowing him to testify. Moreover, to the

extent that counsel may have advised Liberal that it was not in his
best interest to take the stand, it cannot be said that the advice
was unsound strategy, or unreasonable under Strickland, where it is
possible that if he had chosen to testify the jury may well have not
found his testimony to be credible.

**GROUND 5**

As noted above, Liberal claims in Ground 5 that Officer Harrell
during direct examination made a misstatement of fact, and was
allowed to correct his testimony, and explain away his misstatement,
with an explanation that he mis-spoke because he had been awake for
24 hours. Liberal claims that Harrell had been "impeached," and, in
that regard, it appears that Liberal is essentially arguing that
because Harrell's corrected testimony, and his initial testimony
were in conflict, Harrell's testimony was self-impeaching. Liberal
also argues that counsel was ineffective for failing to raise an
objection when Harrell was permitted to explain that he had been
awake for 24 hours, as the explanation could tend to make the jury
feel sorry for him, and serve to bolster Harrell's testimony.

The record shows that the event occurred after Officer Harrell
was asked if anyone claimed ownership of items in the car trunk. He
first testified that, when he questioned the men at the scene of the
traffic stop, none of the 4 passengers in the Nissan had claimed
ownership of items found in the car trunk [Jackson Memorial Hospital
face sheets, a laptop computer, and notebooks]. Then, upon request
of the prosecution, Harrell (by review of a report) was allowed to
refresh his memory and correct his testimony. The Court, at request
of the defense, ruled that the initial response or testimony would
be stricken, and that the question would again be put to the
witness. The Court instructed the jury that some prior testimony
needed to be corrected, and that the witness's testimony would
proceed, his recollection having been refreshed.  Harrell's
corrected testimony was that Stevenson Benoit had initially claimed

ownership of the face sheets, and of the laptop and notebooks saying
he needed them for school. Harrell also testified that Benoit later
recanted his statement and said the items were in the car when he
had rented it. It was Harrell's explanation that his earlier mis-
statement [i.e., that noone had claimed ownership of the items in
the trunk] was a result of his being tired, because he had been
awake for 24 hours after working a midnight shift before coming to
court. (See Cr:DE211, *T/138-147*)

Thus, Liberal argues that Harrell's testimony was "impeached,"
because Harrell initially said noone had claimed ownership of items
in the car trunk, and then Harrell's corrected testimony indicated
that Stevenson Benoit had made a statement [although later recanted]
which admitted <u>his</u> [Stevenson Benoit's] ownership of items found in
the trunk of the car, including the laptop computer and notebooks.

While, on one hand, Liberal argues that the statement heard by
the jury that Harrell was fatigued [offered by the prosecution as
a reason to allow him to refresh his memory and correct his
testimony] could have engendered sympathy for Harrell, it appears
illogical, on the other hand, for Liberal to complain that counsel
should have objected to the statement, since the witness Harrell's
corrected testimony on direct examination arguably was harmful to
the State's case, as it served to deflect at least some culpability
away from Liberal, and place it in the hands of Stevenson Benoit.
The corrected testimony also offered Attorney Levin additional
opportunity to further question Harrell on cross-examination, and
in doing so, re-emphasize the officer's earlier statement/admission
that the Co-defendant Benoit had [at least temporarily] claimed
ownership of technology and materials located in the trunk of the
car in which Liberal had been a passenger. Certainly, counsel's
decision to not object to the Officer's explanation, was a matter
of trial strategy that was reasonable, and does not provide a basis
for a finding of ineffective assistance. Moreover, even if, assuming

*arguendo,* it could be argued that counsel should have objected to any emphasis on the Officer's fatigue, on grounds that tended to engender sympathy for the State's witness, it is apparent that the defendant Liberal here, as a Section 2255 Movant, cannot satisfy the prejudice prong of <u>Strickland</u>, in light of the overwhelming nature of the evidence against him.  Based on the allegations/claims in Ground 5, Liberal's ineffective assistance claim therefore fails, and on those assertions he is entitled to no relief.

## <u>GROUND 6</u>

In this ground, Movant Liberal claims that Attorney Levin conceded his guilt during closing argument. That, however, is not what occurred.  The record shows that during closing argument Mr. Levin conceded that the man shown in the Target store security videos was indeed Liberal. This, however, was not an admission of guilt. Instead, it clearly was a reasonable strategy. Where the jury, having viewed the videos, could itself draw the conclusion that Liberal was the man depicted in the videos, and where the government witness Chin (the Target Store Investigator) had given testimony that the cash register records were synchronized with the security videos, the defense [Attorney Levin] had to make choices. Under the circumstances, Mr. Levin chose a reasonable approach for Liberal's defense. While acknowledging that Liberal did appear in the store videotapes, Mr. Levin made the argument that Liberal was innocent, stressing that he did not knowingly use stolen access devices, and did not knowingly possess the means of identification of another, and disputed the existence of the requisite effect on interstate commerce, and he did so vigorously. (Cr:DE214, T/47-70).

A criminal defendant has a right to effective assistance of counsel at closing arguments. See <u>Bell v. Cone</u>, 535 U.S. 685, 701-702 (2002); <u>Herring v. New York</u>, 422 U.S. 853, 865 (1975). "Counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing

presentation is particularly important because of the broad range of legitimate defense strategy at that stage. Closing arguments should 'sharpen and clarify the issues for resolution by the trier of fact,'" Yarborough v. Gentry, 540 U.S. 1, 5-6 (2003) (quoting Bell, 535 U.S. at 862). "But which issues to sharpen and how best to clarify them are questions with many reasonable answers. Indeed, it might sometimes make sense to forgo closing argument altogether. Judicial review of a defense attorney's summation is therefore highly deferential, and doubly deferential when it is conducted through the lens of federal habeas." Yarborough, supra, at 6.

Here, the record indicates that Mr. Levin's tactical decisions, and his choice of argument at closing, were reasonable, given the constraints of the evidence that was adduced at trial against his client, and that he was not ineffective. Indeed, although Liberal ultimately was convicted on counts 1, 2, and 4-6, Liberal was acquitted on counts 3, and 7-17 as a result of Mr. Levin's efforts and representation. The record does not support a finding that counsel's representation at closing fell below the standard of reasonableness contemplated by the Supreme Court under Strickland, generally, and Bell and Herring in the context of closing arguments.

## Ground 9

To the extent the movant Liberal means to argue in Ground 9 that cumulative errors by counsel violated his constitutional rights, that claim fails on the merits. For the reasons stated in this Report, the movant is not entitled to vacatur on any of the claims presented. When viewing the evidence in this case in its entirety, the alleged errors, neither individually nor cumulatively, infused the proceedings with unfairness as to deny the movant a fundamentally trial and due process of law. The movant therefore is not entitled to habeas corpus relief. See Fuller v. Roe, 182 F.3d 699, 704 (9 Cir. 1999)(holding in federal habeas corpus proceeding that where there is no single constitutional error existing, nothing

27

can accumulate to the level of a constitutional violation), overruled on other grounds, Slack v. McDaniel, 529 U.S. 473, 482 (2000). See also United States v. Rivera, 900 F.2d 1462, 1470 (10 Cir. 1990)(stating that "a cumulative-error analysis aggregates only actual errors to determine their cumulative effect."). Contrary to the movant's apparent assertions, the result of the proceedings were not fundamentally unfair or unreliable. See Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993).

**GROUND 10**

Finally, in his last ground for relief, the Movant Liberal claims that counsel failed to preserve issues for appeal. The sole issue specifically identified by Liberal in conjunction with this assertion, however, is referenced in his Memorandum (Cv:DE4 at p.10). There, Liberal asserts that counsel did not preserve as an issue for appeal, the fact that Officer Harrell had been awake for 24 hours when he did not object to the explanation that Harrell had "been awake for 24 hours as a way to extract sympathy from the jurors and bolter [sic] officer's testimony, even when it was clear he had been impeached." Liberal claims that counsel's failure to object was a error which "greatly prejudiced" him and deprived him of "a fair trial." This claim, as discussed above in conjunction with ground 5, was without merit, and provided no basis for a finding of ineffective assistance. Hence, the Movant Liberal's claim here, in Ground 10, that counsel was ineffective for failing to object and preserve the matter as an issue for appeal is without merit. Chandler v. Moore, supra, 240 F.3d at 917 (counsel not ineffective for failing to raise non-meritorious objection). Moreover, it is apparent that even if Attorney Levin had objected to the offering of the explanation [that the witness mis-spoke because he was tired], thereby preserving the issue, that does not mean that the issue would thereby be one that was meritorious which should have been raised on appeal. Cf Card v. Dugger, supra, 911 F.2d at 1520 (appellate counsel not ineffective for failing to raise

meritless issues).

### IV    CONCLUSION

It is therefore recommended that: 1) the Movant Whitney Liberal's Motion to Vacate pursuant to 28 U.S.C. §2255 (Cv:DE1) be DENIED as to all claims; and 2) this case be CLOSED.

Objections to this report may be filed with the District Judge within Fourteen days of receipt of a copy of the report.

Dated: June 7th, 2011.

_____
UNITED STATES DISTRICT JUDGE

cc:  Whitney Liberal, *Pro Se*
     Reg. No. 86363-004
     FCI Terminal Island
     Federal Correctional Institution
     P.O. Box. 3007
     San Pedro, CA 90731

     John D. Couriel, AUSA
     United States Attorney's Office
     99 N.E. 4th Street
     Miami, FL 33132